Mildred J. JACOBSON, Basil D. Jacobson, by Mildred J. Jacobson, his next friend, and Priscilla J. Jacobson, by Mildred J. Jacobson, her next friend, Appellants,

v.

COLORADO FUEL AND IRON CORPORATION, a corporation, Appellee.

No. 22322.

United States Court of Appeals
Ninth Circuit.

March 26, 1969.

---

Cresap S. McCracken (argued), and Douglas C. Allen (argued), of Church, Harris, Johnson & Williams, Great Falls, Mont., for appellants.

Joseph R. Marra (argued), of Angland & Marra, Great Falls, Mont., for appellee.

Before KOELSCH and HUFSTEDLER, Circuit Judges, and HAUK,* District Judge.

HAUK, District Judge:

This appeal arises in a wrongful death action based upon claimed "products liability" of a manufacturer-supplier of steel strand which was being used in a concrete prestressing operation by de-

---

* Hon. A. Andrew Hauk, United States District Judge, Los Angeles, California, sitting by designation.

cedent's employer, the purchaser of the strand, when it snapped and caused the death of the decedent who was foreman of the project.

The District Court, with jurisdiction by reason of diversity of citizenship and amount in controversy (28 U.S.C. § 1332 (a) (1), (c)),[1] tried the case without a jury, and with detailed findings of fact and conclusions of law granted judgment for defendant (appellee herein), holding that plaintiffs (appellants herein) upon the evidence adduced and the law governing the case had failed to sustain their burden of proof. We have jurisdiction under 28 U.S.C. § 1291,[2] timely and appropriate notice of appeal having been duly given and filed.

The relevant facts are not in dispute but we recite them here at the outset to assist our consideration of the contentions of the parties. Plaintiffs are the widow and children of DeRay Jacobson, employed at his decease as a foreman by United Prestress, Inc. Defendant, Colorado Fuel and Iron Corporation (hereinafter referred to as CF&I), manufactured a type of steel strand, 7/16″ in diameter and designated 270K, which was being used by United Prestress, Inc., in two ways: (1) as horizontal reinforcing tendons, and (2) as vertical hold-down cables. The former method of use was that for which the strand was primarily designed and sold; whereas the latter use was designed by the technicians working

for decedent's employer. On the day in question 22 strands of this type 270K wire product were being used as horizontal tendons, and 4 of these strands were being used as vertical hold-down cables in the manufacture of prestressed concrete items. Two of these 4 hold-down cables broke under very heavy stress during the prestressing operation, and as a result DeRay Jacobson received the injuries from which he died.

At the time of the death of plaintiffs' decedent, United Prestress was in the process of manufacturing two 90-foot prestressed single T roof beams. The prestressing of these concrete members involved the pouring of the concrete around the 22 horizontal tendon strands which had been stretched to a calculated tension. The casting bed, 230 feet long and divided into two equal sections, was being used as a mold for fabricating the two 90-foot single Ts with three hold-up points, one at the dead end where the strands were initially securely anchored, one in the middle through which the strands were passed, and one at the live end where they were again anchored. At the time of the accident, the 22 horizontal tendon strands had been anchored at the dead end, threaded through the middle hold-up point, and anchored at the live end. These strands were placed at precalculated levels in the casting bed at varying elevations from the floor of the bed. The strands were then tensioned by horizontal stretching, accomplished

---

1. 28 U.S.C. § 1332(a) (1)
"§ 1332. Diversity of citizenship; amount in controversy; costs
(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and is between—
(1) citizens of different States;"
28 U.S.C. § 1332(c)
"(c) For the purposes of this section and section 1441 of this title, a corporation shall be deemed a citizen of any State by which it has been incorporated and of the State where it has its principal place of business: *Provided further*, That in any direct action against the insurer of a policy or contract of

liability insurance, whether incorporated or unincorporated, to which action the insured is not joined as a party-defendant, such insurer shall be deemed a citizen of the State of which the insured is a citizen, as well as of any State by which the insurer has been incorporated and of the State where it has its principal place of business."

2. 28 U.S.C. § 1291
"§ 1291. Final decisions of district courts.
The courts of appeals shall have jurisdiction of appeals from all final decisions of the district courts of the United States * * * except where a direct review may be had in the Supreme Court."

**1266**

by moving the live end a predetermined distance, and were thereupon deflected downward another predetermined distance by the use of a hydraulic hold-down device.

As the process progressed, the 22 horizontal tendon strands were being depressed to points near the floor of the bed at two hold-down places in each of the 90-foot Ts. At the start of this "harping" process the horizontal tendons were stretched longitudinally through the length of the casting bed; each pair of longitudinal strands bore a different amount of tension than every other pair, depending upon its relative position and distance from the floor of the casting bed. It was necessary to apply a vertical force to each pair of strands at two points in each T in order to depress all the strands to points close to and approximately the same distance from the floor of the casting bed. The vertical force was supplied by two hydraulic rams which were operated from the top of the casting bed. The rams were intended to be operated together so that at any given time the points at which the strands were being depressed by each ram would be the same distance from the floor of the casting bed. Each ram had a five-inch stroke so that after the strands were depressed five inches it was necessary to hold the strands in position while the piston of the ram was pulled back preparatory to a new thrust.

Part of the hold-down device consisted of a saddle, an inverted "U" made of steel plate which gathered the horizontal tendons together. At each of the four hold-down points, a vertical hold-down cable was anchored to the beam plate beneath the floor of the casting bed by means of a Supreme Chuck (a standard wedge grip), and was then threaded through the floor of the form, through the saddle, through a steel spacer box open on one side, through another Supreme Chuck, out through the top of the box, through the ram and finally through another Supreme Chuck. The Supreme Chucks were so designed and positioned that as the tension on the hold-down cable in-

creased, the grip of the Supreme Chuck on top of the ram and the grip of the Supreme Chuck beneath the floor of the form were both increased. But when the tension on the hold-down cable was released, the grip of the Supreme Chuck atop the hydraulic ram was also released. Thus, the Supreme Chuck on top of the ram held the ram in a fixed position on the hold-down cable as the piston of the hydraulic ram was being extended; and the Supreme Chuck in the steel box held the saddle in place when the pressure of the ram was removed.

On the day in question, this process had been completed in one of the Ts and the strands had been locked at the two hold-down points in that particular T. The crew was in the process of exerting vertical force on the other hold-down cable at the remaining two hold-down points in the second T, and the saddles were within an inch or two of the floor of the casting bed when the workmen heard a noise. The rams were turned off and then started again. Another noise was heard. When each of the noises occurred the hold-down devices and the two hold-down cables jumped a little bit. The witnesses could not tell from the noise or movement what had happened in the casting bed. The decedent foreman was called to the scene and informed of the situation. He sent a man to inspect under the casting bed. When this inspection revealed nothing, the decedent ordered the rams to be started again. The rams were turned on briefly—nothing happened; but when they were started again, the two hold-down cables snapped, one right after the other. As a result the tension on the 22 horizontal tendon strands was released and the decedent was hit by some of the flying iron and steel, receiving the injuries from which he died.

Plaintiffs' contentions at the trial, reasserted here on appeal, are basically two:

(1) That defendant CF&I breached express and implied warranties; and

(2) That defendant CF&I is strictly liable in tort for failure to warn of

dangers in a nondefective but potentially harmful product.

The other contentions of the plaintiffs made upon this appeal are essentially part of and in support of these two basic contentions, or, like the original contention of negligent manufacture, have been abandoned by the plaintiffs on appeal.

Before taking up these two contentions and disposing of them, we note that the District Court, after complete and thorough litigation of the issues, both factual and legal, made its findings in favor of the defendant and against the plaintiffs, analyzing these contentions and finding them without merit. Bound as we are by Rule 52(a) of the Federal Rules of Civil Procedure [3] and the leading cases both in this Circuit and the Supreme Court,[4] we, too, find these contentions are without merit.

Giving due regard, as we must, to the duty of the trial court to judge the "credibility of the witnesses" and obedient to the mandate that "findings of fact shall not be set aside unless clearly erroneous" we here, as in Lundgren v. Freeman, 307 F.2d 104, 113 (9th Cir. 1962), " * * * may not substitute our judgment if conflicting inferences may be drawn from the established facts by reasonable men, and the inferences drawn by the trial court are those which could have been drawn by reasonable men."

Nor can we second-guess the trial court or hold a trial de novo although we may and do review the trial judge's findings of fact to see that justice has been done. Lundgren v. Freeman, supra, at p. 114. Our review convinces us here that the evidence adequately and beyond question supports the findings of fact of the District Court, and requires that we affirm the judgment.[5]

We now proceed to consider the two basic contentions of plaintiffs on this appeal.

## I

### DEFENDANT CF&I DID NOT BREACH ANY EXPRESS OR IMPLIED WARRANTY

Defendant, in the brochure on Type 270K strand, CF&I Bulletin No. P.C. 955, which was furnished to the trade, represented and in effect warranted that its $\frac{7}{16}''$ diameter 270K strand had a minimum ultimate strength of 31,000 pounds.[6]

---

3. Rule 52.

 FINDINGS BY THE COURT

 (a) Effect. In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58; and in granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its action. Requests for findings are not necessary for purposes of review. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court. If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein. Findings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 or any other motion except as provided in Rule 41(b).

4. Lundgren v. Freeman, 307 F.2d 104, 113–115 (9th Cir. 1962) ; United States v. United States Gypsum Co., 333 U.S. 364, 393–399, 68 S.Ct. 525, 92 L.Ed. 746 (1948) ; United States v. Yellow Cab Co., 338 U.S. 338, 341–342, 70 S.Ct. 177, 94 L.Ed. 150 (1949).

5. We certainly cannot in good conscience say that the findings of the District Court were "clearly erroneous". To do so would, in the language of Mr. Justice Reed in United States v. United States Gypsum Co., 333 U.S. 364, at 395, 68 S.Ct. 525, at 542, 92 L.Ed. 746 (1948), require us to say that this Court "on the entire evidence is left with the definite and firm conviction that a mistake has been committed." We are unable to find any such mistake, nor are we able to conclude that justice has not been done.

6. Plaintiff's Exhibit No. 1 (Table II) CT 122, RT 2, 3. Reference is made to the Clerk's Transcript and to the Reporter's

Plaintiffs contend that this meant that the 270K strand should withstand 31,000 pounds of tension during the pre-stressing procedure. However, this contention is not supported by the evidence. Jack Janney, a consulting structural engineer, called as an expert witness for the defense, stated that "31,000 pounds minimum ultimate strength" does not mean that a strand could be expected to sustain 31,000 pounds of tension when used in a hydraulic hold-down device as it was used here.[7] Mr. Janney also testified in effect that Table II of Exhibit 1 limited the representation of 31,000 pounds minimum ultimate strength to 70 percent thereof at initial tension—a figure of 21,700 pounds—and added that it would be "common knowledge with an engineer", and certainly would be known by a "knowledgeable engineer who has experience with prestress concrete" that the hydraulic hold-down device and 270K strand would not develop 31,000 pounds, and further that he would be "quite surprised" if it would develop 70 percent of ultimate strength of the strand over a long period of time, because of the biting action of the chucks.[8]

And even plaintiffs' own expert, Dr. Arthur Anderson, testified that it would be common knowledge to engineers in the prestress concrete industry that one should not expect to develop 31,000 pounds of minimum ultimate strength when a Supreme Chuck is used.[9]

Mr. Janney further testified that the representation in defendant's brochure that the 270K strand had a breaking strength of 31,000 pounds does not tell anyone in the prestress concrete industry that this strand could withstand 31,000 pounds of tension under these conditions.[10] Instead, this representation relates to the strength of the strand within the finally cast beam. Moreover, the additional representation "Initial Tension—70% Ult. 21,700 pounds" means that no more than 21,700 pounds of tension should be put on the strand before the concrete is cast around it.[11] And that "the experienced designer or operator knows that if you put a load of more than 21,700 pounds of tension on the strand it is likely to break." [12]

The deposition of Kent Preston, defendant's expert, established that the piece of 270K strand which first failed did meet the requirements of the specifications in the brochure, plaintiffs' Exhibit 1.[13]

Moreover, Mr. Preston stated that the first strand which failed was actually stronger than the 31,000-pound specification. He estimated the ultimate strength of that strand to be 31,923 pounds.[14] And the report of the Pittsburgh Testing Laboratory found that the breaking strength met and exceeded the defendant CF&I's brochure specification of 31,000 pounds minimum.[15] Stephen Teleshak, the author of that report testified that the first strand which failed exceeded the brochure specification by 930 pounds.[16]

What, then, caused the strand to fail? The report of the Pittsburgh Testing Laboratory, as confirmed by Mr. Teleshak, disclosed no evidence of metal-

Transcript, referred to respectively as "CT" which is Volume One of the Transcript of Record, and "RT", which consists of Volumes Two through Six of the Transcript of Record herein.

7. RT 424.

8. RT 424–425. Investigation following the accident revealed that the strands which failed had substantial nicks caused by the gripping of the chucks. The wedges in the Supreme Chucks have teeth which bite into the strands as tension is increased. See Plaintiff's Exhibit 4, CT 123, RT 2, 3.

9. RT 165–166.

10. RT 464–5.

11. RT 465.

12. Ibid.

13. Plaintiff's Exhibit 11, p. 12, CT 123, RT 2, 3.

14. Ibid.

15. Plaintiff's Exhibit 4, supplement (Oct. 10, 1966). CT 123, RT 2, 3.

16. RT 326.

lurgical or manufacturing defects.[17] The report concluded that the mechanical damage, caused by nicks, due to the gripping action of the chucks, was a contributory cause of failure, but the principal cause of failure was "overload under the conditions of this particular use." [18]

Mr. Janney testified that in order to develop full strength of the 270K strand, the load must be applied in a perfectly axial manner.[19] Any misalignment would cause a reduction in the strength of the strand due to overloading. Mr. Teleshak described misalignment as an added factor leading toward nonuniform loading and, consequently, premature failure of the strand.[20] This misalignment transferred the load to one or two strands rather than uniformly distributing the tension. On this point Mr. Janney concluded:

"* * * [T]he use of this type of chuck * * * has a tendency to reduce load carrying capacity of this element by a considerable amount. Of course, this depends on the condition of the chuck, the manner in which it's maintained in place, how well things are centered, and the alignment." [21]

Mr. Teleshak similarly concluded that there were many factors which might have substantially contributed to the failure—"the effects of installation—misalignment, eccentricity of loads, and the quality of the grips. * * * Whether they, in fact, themselves, are properly in alignment." [22]

From the foregoing analysis of the evidence, it is apparent that plaintiffs did not sustain their burden of proving by a preponderance of the evidence that the defendant had breached an express or implied warranty. And indeed we cannot possibly say that the pertinent findings of the trial court were clearly erroneous. Rather, we are inclined to and do adopt the District Court's language in its Finding No. XII as clearly correct:

"The reference in the literature to the 31,000 pounds minimal strength, whatever it may mean, is not a warranty that under all conditions of use the strand will withstand a force of 31,000 pounds. * * * Whether the statements in the literature can be considered as warranties or as representations, the court finds that they do not mean to the persons to whom the literature was directed that a piece of 270K strand could be used in a hold-down device and withstand a force of 31,000 pounds no matter what the mechanical damage caused by the chucks, the stresses created by misalignments, and the sudden loadings caused by lateral movement of the saddle." [23]

We are convinced that the District Court reached the correct result. The warranties, express or implied, all dealt with performance of the strand as part of the finished product (the concrete beam), and not with the capability of the strand in a hold-down device such as the one used here in the prestressing process.

## II

DEFENDANT CF&I IS NOT STRICTLY LIABLE IN TORT FOR FAILURE TO WARN OF DANGERS IN A NONDEFECTIVE BUT POTENTIALLY HARMFUL PRODUCT, TO WIT, ITS TYPE 270K STRAND

Plaintiffs contend that the District Court erred in applying the relatively new decisional law imposing strict liability upon manufacturers and suppliers

---

17. RT 320, 407.

18. Plaintiff's Exhibit 4, p. 6. CT 123, RT 2, 3.

19. RT 419–420.

20. RT 316.

21. RT 422.

22. RT 379.

23. CT 230.

of chattels which, although nondefective in and of themselves and nondefective by reason of their manufacture or other work done upon them by the manufacturers and suppliers, are nevertheless potentially harmful products. Plaintiffs assert that defendant CF&I's type 270K strand is a potentially harmful product even though nondefective, and that because the information in defendant's brochure, Plaintiffs' Exhibit 1, was not specifically communicated to plaintiffs' decedent, Mr. Jacobson, the "duty to warn" inherent in the law governing the manufacture and supply of nondefective but potentially harmful products was breached by defendant.

 In the absence of controlling decisions of the Montana Supreme Court,[24] the District Court properly looked to and adopted Section 388 of the Restatement of the Law of Torts, 2d, as the law of Montana. Plaintiffs do not find fault with the trial court's choice of law, nor do we. But plaintiffs contend that a specific warning directed to Mr. Jacobson personally was essential to the safe use of CF&I's type 270K strand. With this we disagree. Section 388 of the Restatement of the Law of Torts, 2d, provides as follows:

> "§ 388. *Chattel Known to be Dangerous for Intended Use*
>
> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier,
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

> (b) *has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition,* and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous." (Emphasis supplied).

Comment *k* of this section amplifies the meaning of clause (b) as follows:

> "*k When warning of defects unnecessary.* One who supplies a chattel to others to use for any purpose is under a duty to exercise reasonable care to inform them of its dangerous character in so far as it is known to him * * * if, but only if, he has no reason to expect that those for whose use the chattel is supplied will discover its condition and realize the danger involved. * * * However, the condition, although readily observable, may be one which only persons of special experience would realize to be dangerous. In such case, if the supplier, having such special experience, knows that the condition involves danger *and has no reason to believe that those who will use it will have such special experience as will enable them to perceive the danger,* he is required to inform them of the risk of which he himself knows and which he has no reason to suppose that they will realize." (Emphasis supplied).

In addition, it is clear that in the absence of such a warning, the manufacturer/supplier will be found strictly liable in tort for the resultant damages. This rule is based on Section 402A of the Restatement of the Law of Torts, 2d, and a recent Ninth Circuit decision teaches that Montana law, as discovered and interpreted in our Circuit adheres to this principle. Davis v. Wyeth Laboratories, Inc., 399 F.2d 121 (9th Cir. 1968).

---

24. State law obviously governs the substantive issues in this case under the doctrine of Erie R. Co. v. Tompkins,

304 U.S. 64, 58 S.Ct. 817, 82 L.Ed.2d 1188 (1938).

Section 402A of the Restatement of the Law of Torts, 2d, provides as follows:

"§ 402A. *Special Liability of Seller of Product for Physical Harm to User or Consumer*

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

It will be noted that this Section requires that the product be both "defective" and "unreasonably dangerous". Nevertheless, *Davis* distills the essence of the rule to be that the manufacturer is under a duty to warn of dangers in "nondefective" but potentially harmful products. It pursues the rationale that if the product is unreasonably dangerous and a warning should be given but is not given, then the product is automatically "defective", resulting in the rule of the manufacturer's duty to warn of dangers in "nondefective" but potentially harmful products. Davis v. Wyeth Laboratories, Inc., *supra*, 399 F.2d 121, at 126–127, 128–130.

In effect, then, *Davis* does away with the Restatement requirement that a product be defective and thereupon applies the Restatement rule as "Federally discovered" Montana law.

Applying that rule to the case here before us, and assuming that the wire strand was unreasonably dangerous in the use to which it was put (a use which was known to the manufacturer, as the trial court found in Finding of Fact XIV),[25] the question then becomes whether a warning was required to be given.

The trial court relied upon a Third Circuit case, Hopkins v. E. I. DuPont de Nemours & Co., 212 F.2d 623, at 625 (3rd Cir. 1954), in applying the rule set forth in Section 388 of the Restatement of the Law of Torts 2d which does *not* require a warning to be given where the manufacturer has reason to believe that those for whose use the chattel is supplied already know or will realize its dangerous condition.

In *Hopkins,* the blasting foreman of the purchasing company had knowledge of the danger of premature explosion of dynamite placed in a newly drilled hole before allowing the heat caused by the drilling to escape, and therefore the manufacturer of the dynamite was not liable for failing to warn the purchaser of the dynamite concerning this dangerous condition.

This is a salutary rule because obviously there is no point in giving a warning of a dangerous product to the purchaser whose supervising personnel, the ones who are going to direct the use of it, already have sufficient knowledge of the danger inherent in the product.

Turning to the case before us, it is clear from the record and the findings of the trial court that the purchaser of the product, United Prestress, Inc., and its supervising personnel had full knowledge that use of the defendant CF&I's Type 270K as a hold-down device was extremely hazardous and potentially harmful.

According to the defense expert Jack Janney, it is well known that this type of hold-down device will reduce the ultimate strength of the strand by a con-

siderable amount.[26] Mr. Janney also testified that it is understood in the prestress concrete industry that if you put tension of more than 70 percent of ultimate strength on the strand during the prestressing process it is apt to break.[27]

Floyd Swenson, a civil engineer employed by the purchaser, United Prestress, Inc., and in charge of the design project in the course of which the defendant's Type 270K strand was used as a hold-down device (although not the actual designer of the hold-down device itself), was aware of the danger in such use of this product.[28] Mr. Swenson admitted that on the day in question the shop calculations called for the tensions to exceed 70 percent of the ultimate strength of the strand, and that the tension did in fact exceed 70 percent in "initial tension".[29]

The decedent, Jacobson, who was the foreman of the project, worked under the supervision of Harry Knight, the Plant Superintendent, who was in turn working under the instructions and supervision of Albert W. Young, the Production Coordinator.[30] Mr. Young testified that he was aware of the danger inherent in the use of the Type 270K strand as a hold-down device,[31] and that he would not recommend the use of this strand as a hold-down device at any force exceeding 18,000 pounds.[32] If the theoretical force exceeded 18,000 pounds, Mr. Young said he would advise the use of two hold-down strands. He also was well aware that on the day Jacobson died, the design calculations showed that the vertical force exerted by this hold-down use of the Type 270K strand would be at least 22,500 pounds, and he admittedly knew that there had been hold-down strand breaks at the plant before this time.[33]

The adoption of a substantial safety factor in projects such as the instant one is a common practice. The defense expert, Kent Preston, stated:

"* * * [I]t is standard procedure to use a factor of safety of two. In other words, the tension in the strand, when used as a hold-down, should not exceed fifty per cent of its ultimate strength."[34]

The theoretical tension on the first strand which failed was 72 percent of its ultimate strength. Jack Janney testified that he would recommend at least a safety factor of two, and that he personally preferred a higher safety factor on a project of this nature because it doesn't involve a large expense to the plant.[35] He also stated that a knowledgeable engineer would not use one hold-down strand in a device such as the one used by United Prestress, Inc., in the project in question.[36] Plaintiffs' expert, Dr. Arthur Anderson, testified that he also would not have used one strand in this type and configuration of hold-down device.[37]

■ Decedent's employer and its supervising personnel should have known and actually did know the dangers inherent in the *use* of defendant's product in the hold-down device. Any breach of duty owed to the decedent with the resultant strict tort liability, if any, was the liability of decedent's employer and supervising personnel and not the liability of defendant.

Plaintiffs next contend that representatives of defendant CF&I had visited the plant and had seen the particular hold-down device, and thus had a duty to warn of the danger. However, Mr.

26. RT 419.

27. RT 465.

28. RT 83–84.

29. RT 81–82.

30. RT 30–31.

31. RT 41.

32. RT 37–38.

33. RT 38–40.

34. Plaintiff's Exhibit 11, p. 21. CT 123, RT 2, 3.

35. RT 425–426, 454.

36. RT 425.

37. RT 160.

Floyd Swenson, the design engineer at the plant, admitted that the CF&I representatives did not give any information regarding the strength characteristics of the 270K strand.[38] The plant's Production Coordinator, Albert W. Young, testified that he knew that the CF&I representatives were not engineers and that they were incapable of giving any advice as experts.[39] There is no evidence that (1) CF&I's sales representatives possessed sufficient technical knowledge to enable them to advise defendant CF&I or to warn United Prestress, Inc., the decedent's employer, of the danger in the use of 270K strand as a hold-down; (2) that the sales representatives had any knowledge of the pounds of tension on the 270K strand in this type of hold-down device use; or (3) that the sales representatives did in fact advise CF&I of this dangerous use of its product by United Prestress, Inc. Thus it appears that this contention is also without merit.

██ From the foregoing discussion, it is clear that the purchaser of the product, United Prestress, Inc., and its supervising personnel, had full knowledge of the fact that this use of the Type 270K strand product as a hold-down device was extremely hazardous and potentially harmful. Under the Restatement of the Law of Torts, 2d, Sections 388 and 402A, as well as under *Davis* and *Hopkins*, cited earlier, the manufacturer had no duty to warn the purchaser of this danger already known by the purchaser and its supervising personnel.

██ It follows that the trial court's findings in favor of the defendant manufacturer and supplier, CF&I, are clearly within the purview of the trial court and while there is some slight conflict in the evidence, it does not warrant us in finding to the contrary. The overwhelming weight of the evidence preponderates in favor of the trial court's findings and we approve and adopt its conclusions of law, and particularly No. VI:

"Where a supplier furnishes chattels, the use of which is to be directed by technicians or engineers, it is sufficient to insulate the supplier from liability for failure to warn if the warnings given are sufficient to apprise the engineers or technicians of the dangers involved, or if the technicians have knowledge of the dangers involved. There is no duty to warn those who simply follow the directions of the engineers or technicians, or to put it differently, there is no duty of a supplier of a chattel to foresee that the engineers or technicians will fail to follow warnings given or to employ knowledge possessed."

Upon this analysis, it is abundantly clear from the evidence, considered with the findings and conclusions of the District Court, that the judgment not only is *not* "clearly erroneous", but is obviously correct.

Judgment affirmed.