Lydia BASKO, Plaintiff-Appellant,

v.

STERLING DRUG, INC., and Winthrop
Laboratories, Defendants-Appellees.

No. 578, Docket 32669.

United States Court of Appeals
Second Circuit.

Argued May 14, 1969.

Decided Oct. 7, 1969.

See also D.C., 268 F.Supp. 26.

418

Morgan P. Ames, Stamford, Conn. (Helen F. Krause, Bridgeport, Conn., on the brief), for plaintiff-appellant.

Paul V. McNamara, Bridgeport, Conn. (Donald J. St. John, Bridgeport, Conn., of counsel), for defendants-appellees.

Before WATERMAN, SMITH and KAUFMAN, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

In the field of drug marketing, as Professor Kessler writes in a thoughtful article, "defining the outer limits of strict liability presents us with most difficult questions of policy." Kessler, Products Liability, 76 Yale L.J. 887, 930 (1967). This case demands analysis of those "outer limits."

The plaintiff, Mrs. Lydia Basko, appeals from a judgment entered for the

defendant drug manufacturers, Sterling Drug, Inc. and Winthrop Laboratories, after a two-week jury trial in the United States District Court for the District of Connecticut, Edward C. McLean, Judge.[1] Her main argument is that the evidence established a case of strict liability as a matter of law, and that Judge McLean erred in not granting her motion for a directed verdict at the close of the case. In addition, plaintiff argues that the jury was erroneously instructed on the theory of strict liability under § 402A of the Restatement (Second) of Torts. Finally, plaintiff urges that Judge McLean erred in not instructing the jury that there could be recovery on the alternative theories of negligence, express warranty, implied warranty, and fraud upon the Food and Drug Administration. We find error in the charge, and reverse.

## I.

From 1953 to 1961 plaintiff was treated with three different drugs for a skin disease called lupus erythematosus. The drugs were sold under the trade names Aralen, Atabrine, and Triquin, and were manufactured by Winthrop Laboratories, a division of Sterling Drug Co., Inc. The drugs had been prescribed for plaintiff by doctors at Yale-New Haven Hospital. In 1956, plaintiff began experiencing a blurring of her vision, although she complained of seeing "butterflies" as early as 1954. From 1961 to 1965 her vision deteriorated quite badly, and she is now almost totally blind.

At trial plaintiff called a number of medical experts who testified that she was suffering from a form of retinal damage known as chloroquine retinopathy. This is thought to be an idiosyncratic side effect of certain drugs made from chloroquine, although there is some evidence to indicate that the idiosyncratic reaction occurs more frequently when chloroquine is administered in high doses. The condition is quite rare, and as one expert testified, chloroquine retinopathy "has an incidence of probably less than half a per cent, maybe as low as a tenth of a per cent, perhaps one in a thousand." According to the prevalent theory, chloroquine has a special affinity for the melanin pigment cells of the eye. Once absorbed by the pigment cells, the chemical inhibits the flow of nutrients to the nervous tissue of the overlaying retina. A second theory, somewhat discredited now, is that chloroquine constricts the blood vessels in the retinal part of the eye.

Plaintiff's first witness was Dr. Marvin Sears, chief ophthalmologist at Yale-New Haven Hospital. He indicated that he had examined plaintiff on December 12, 1962, and stated quite emphatically that she was suffering from an "irreversible" case of chloroquine retinopathy. He based his conclusion on the fact that plaintiff had taken chloroquine in amounts sufficient to cause this condition, and added, "I can't think of any other disease or drug that could do it." When asked how certain he was, Dr. Sears replied, "I'm about as certain as anyone can be about any condition in medicine."

Similar testimony was given by Dr. Howard N. Bernstein, who had done extensive research on chloroquine retinopathy at the National Institute of Health in Bethesda, Maryland, and who had examined plaintiff on July 27, 1966. He said that plaintiff's retinal damage was probably due to long-term treatment with chloroquine drugs, and based his conclusion on the facts that (1) the dosage and duration of treatment were sufficient to cause chloroquine retinopathy, (2) the retinal appearance was similar to other cases of chloroquine retinopathy he had observed, and (3) progressive loss of visual acuity is characteristic of this condition.

Of the three drugs involved in this case, only Aralen and Triquin contain chloroquine ingredients. Atabrine is concededly not made from chloroquine, and there is no evidence in this record to indicate that Atabrine produces damage

---

1. Of the Southern District of New York, sitting by designation.

to the retinal part of the eye.[2] Certainly Atabrine cannot cause chloroquine retinopathy, and plaintiff apparently concedes this much. Under these circumstances, we think that plaintiff failed to make out a prima facie case implicating Atabrine and so hold.

Aralen is the trade name for chloroquine phosphate. By its chemical structure Aralen is known as a 7-chloroderivative of 4-aminoquinoline. It was developed as a substitute for quinine during World War II, and was extensively tested on both animals and humans before being placed on the market. The tests were conducted by both Winthrop Laboratories and a wartime Board for the Coordination of Malarial Studies, and involved the administration of chloroquine to over 5000 human patients under close clinical observation. The tests showed that chloroquine was highly effective in the treatment of malaria, and further showed that chloroquine produced no serious side effects when taken in the normally prescribed quantity.

The most commonly observed side effects of chloroquine were nausea, abdominal cramps, diarrhea, and occasional vomiting. There were also some instances of temporary blurring of vision. Similar blurring had been observed in patients receiving treatment with quinine and other anti-malarial drugs, and the available evidence strongly suggested that the condition was due to a side effect associated with the eye muscles. Upon further investigation it was found that the blurring disappeared when treatment with chloroquine was discontinued, and investigators thus concluded that the condition was reversible and "transitory." Several instances of

corneal opacities were also reported, but these were found to clear up when chloroquine was discontinued.[3]

In 1946, Aralen was approved by the Food and Drug Administration for the treatment of malaria. By 1953 a considerable number of investigators had used Aralen with good results in the treatment of lupus erythematosus and rheumatoid arthritis, and in 1957 the drug was approved for these additional uses. Defendant subsequently prepared an "Epitome" promotional booklet entitled "Chemotherapy of Rheumatoid Arthritis and Other Collagen Diseases with Plaquenil and Aralen," and made the booklet available to physicians through its field representatives or "detail men." The booklet listed "temporary blurring of vision due to weakness of accommodation" as a side effect, and indicated that "[u]ntoward effects are limited in type and, with rare exceptions, are insignificant." For prolonged treatment the booklet recommended a "maintenance dose" of 250 milligrams daily.

Triquin is made from a combination of Aralen, Atabrine, and Plaquenil, and is thus composed of chloroquine phosphate, quinacrine, and hydroxychloroquine sulfate. It was approved by the Food and Drug Administration in 1958, and was placed on the market shortly thereafter.

From the beginning defendant knew of reports of blurring of vision and corneal opacities in patients treated with chloroquine, and this much was conceded by Dr. Edwin J. Foley, vice-president and medical director of Winthrop Laboratories. Indeed, the early literature on Aralen stated that some visual blurring sometimes accompanied the use of chloroquine. Dr. Foley insisted, however, that

---

2. The main adverse effect of Atabrine is a yellowing of the conjunctival membrane in the eye. This clears up when the drug is discontinued.

3. This was substantially corroborated by the deposition of Dr. Bernstein, who said that one of the characteristics associated with the use of chloroquine "is difficulty in focusing both from near to far and from far to near. This is fairly common but is

reversible and no serious problems have been associated with this." Referring to corneal opacities, Dr. Bernstein said that this can occur in 30, 40, or 50 per cent of the patients taking chloroquine. "[I]t is reversible upon stopping the administration and sometimes even disappears when the patient is still taking the medication. It has been felt to be actual chloroquine deposits in the epithelium of the cornea."

the early investigators failed to disclose any instances of damage to the retina, and testified quite emphatically that there was not even the slightest evidence of retinal damage produced by chloroquine at least until 1957. His testimony was substantially corroborated by Dr. Sears, who testified that clinical ophthalmologists did not begin to suspect some connection between chloroquine and retinal complications until around 1957.[4]

In his testimony Dr. Sears made reference to a 1957 article by Dr. Amerigo Cambiaggi entitled "Unusual Ocular Lesions in a Case of Systemic Lupus Erythematosus," and said that this was the first article to attribute retinal damage to chloroquine therapy. We have undertaken an independent review of the early literature, and prior to the Cambiaggi article we are unable to find a single mention of retinal damage in cases where blurring of vision had been reported. It also appears from even the latest literature that no investigator has been able to induce chloroquine retinopathy in rats, rabbits, or monkeys.[5]

While the use of special interrogatories undoubtedly would have made our reviewing task easier, we think that it is highly unlikely from the evidence in this case that a jury would have concluded that the risk of idiosyncratic retinal damage should have been known prior to 1957. Indeed, practically all of the reviewing courts in similar Aralen cases have strongly suggested that the risk of chloroquine retinopathy was not foreseeable until at least 1959.[6]

At this point it is necessary for us to describe the post-1957 medical literature in some detail. The Cambiaggi article described the case of a patient who was treated with chloroquine phosphate and developed unusual fundus lesions.[7] "This case is reported," he wrote, "because I found no report in the literature of fundus lesions caused by lupus erythemato-

---

4. The following colloquy took place when Dr. Sears was questioned on direct examination by plaintiff's counsel:

 Q. How long has chloroquine retinopathy been known to ophthalmologists in this country?

 A. Well, it would be difficult to state the exact date, but I think a fair statement on the part of any physician would have to say that chloroquine retinopathy has been suspected at least as early as 1957.

5. In a 1963 article co-authored by Dr. Bernstein, for example, the following appeared:

 "The mechanism of the toxic reaction of chloroquine on the retina is not yet understood. Hobbs, Sorsby, and Freedman were unable to produce a retinopathy by acute intravenous administration of the drug in rabbits. * * * The absence of a specific effect of chloroquine on the rod and pigment layer of the retina in rabbits led Hobbs, Sorsby, and Freedman to suggest that a vascular mechanism was responsible for the human retinopathy. Our attempts to produce a retinopathy in both albino and pigmented rats by the chronic oral administration of chloroquine have been equally unsuccessful, although the animals developed marked keratopathies and cataracts from the treatment."

 Okun, Gouras, Bernstein, and von Sall-

mann, Chloroquine Retinopathy, 69 Arch.Ophth. 59, 68 (1963).

6. In Sterling Drug, Inc. v. Cornish, 370 F.2d 82, 84 (8th Cir. 1966), for example, the Eighth Circuit wrote: "Chloroquine retinopathy is a relatively recent medical discovery. The first article to describe the condition appeared in a British medical journal in October, 1959 * * *. Thereafter, several other articles were written and published in various medical journals. The early articles were cautious in attributing the condition to chloroquine treatment. As more cases were developed and examined, the connection between the drug and the retinal damage became more definite." The medical literature is exhaustively canvassed in Sterling Drug, Inc. v. Yarrow, 408 F.2d 978, 985–987 (8th Cir. 1969). See also Krug v. Sterling Drug, Inc., 416 S.W.2d 143, 152 (Mo.1967), where the Missouri Supreme Court said: "[T]he available medical literature as early as 1957 and certainly by 1960 was such that 'Sterling knew or had reason to know that some persons would be injured by the drug's side effects.'"

7. The fundus is the interior part of the eye opposite the pupil as seen through an ophthalmoscope. For our purposes, the fundus can be said to include the retinal part of the eye.

sus similar to those of the patient." Dr. Cambiaggi indicated that chloroquine treatment "was discontinued because of the suspicion that it might have caused ocular disturbances," but said he thought that the fundus lesions "were due to lupus erythematosus because of the simultaneous presence of other fundus lesions commonly related to lupus erythematosus and also because of concurrent appearance of the ocular alterations and recurrences of lupus erythematosus. * * * I think that chloroquine can be ruled out as a causative factor, since discontinuation of this drug did not result in improvement."

Dr. Catherine Roth, associate medical director of Winthrop Laboratories, testified that she had read the Cambiaggi article shortly after its publication, and said she thought that Dr. Cambiaggi had reached the conclusion that the fundus lesions were not due to chloroquine therapy. Dr. Sears, however, was of the opinion that the article supported the opposite conclusion:

Q. Toward the end of your testimony, you mentioned the Cambiaggi report. You don't advance that report as tending toward the belief, at that time, that Dr. Cambiaggi believed that case to be chloroquine retinopathy, do you?

A. I do.

Q. Didn't Dr. Cambiaggi say, at the conclusion of the report, that it wasn't?

A. That is what he said. That is not what we said. High index of chloroquine toxicity.

Q. You cite his article but disagree with the conclusion?

A. It's done all the time.

The next significant date is October, 1959, when a team of British investigators published an article entitled "Retinopathy Following Chloroquine Therapy" in a highly respected British medical journal. (Both Dr. Foley and Dr. Roth conceded at trial that they had seen the article shortly after its publication.) The investigators reported three cases of retinal lesions in patients who had been treated with chloroquine for lupus erythematosus and rheumatoid arthritis, and definitely concluded that the retinal lesions were due to chloroquine therapy. On the evidence presented, they wrote, "the retinopathy here described results from treatment with chloroquine compounds." In all three cases the patients had been taking chloroquine for approximately three years, and the severity of retinal damage seemed to show some correspondence to the dose used. When chloroquine treatment was discontinued, their conditions did not improve, although the retinal lesions "ceased to progress." Significantly, the investigators indicated that retinal changes similar to those seen in the patients under study had not been previously reported in the literature. Plaintiff introduced this article into evidence as Exhibit P, and we shall refer to it as the Hobbs Report.

The Hobbs Report was read and discussed by various members of defendant's medical research department, and in the summer of 1960, defendant advised the Food and Drug Administration that it wished to revise its literature on Aralen and Triquin. Various promotional materials, including product cards and package inserts, were subsequently rewritten, although it is not clear whether the early "Epitome" booklet remained in circulation.

In 1959, the product card on Aralen warned of "[t]emporary blurring of vision due to interference with accommodation," as well as corneal opacities, and advised periodic eye examinations. In addition to the above warning, the 1960 product card referred to the Hobbs Report by name, and indicated that "[r]etinal vascular response" had been observed in three patients. "Macular lesions and narrowed retinal vessels, and the scotomatous vision and field defects to which they gave rise, although evidently irreversible, ceased to progress on discontinuation of therapy." The card advised periodic eye examinations, and added, "Lowering of dosage or continuing the drug is a matter for the physi-

cian to decide and depends on such factors as ophthalmologic progression, and severity and clinical response of the disorder under treatment." The same warning was given in 1961. In 1962, the card was changed to warn that "[r]etinal changes, consisting of narrowing of the retinal arterioles, macular lesions (areas of edema, atrophy and abnormal pigmentation), pallor of the optic disc, optic atrophy and patchy retinal pigmentation, have been reported as rarely occurring within several months to several years of chloroquine therapy. * * * Retinal changes were found to be practically irreversible and like the accompanying visual defect may progress on discontinuation of therapy." The card advised tri-monthly examinations. For the same years identical warnings were given on the product cards for Triquin. The package inserts and other descriptive literature for both drugs were similarly worded.

In 1963, investigators at the National Institute of Health completed a study of various cases of "chloroquine-induced retinopathies," and reported that "[t]he appearance of a similar retinopathy in patients with different underlying diseases, all having in common long-term chloroquine therapy, almost certainly implicates chloroquine as the etiologic agent." Shortly thereafter defendent mailed "Dear Doctor" letters to 248,000 physicians warning of the possibility of "impairment of vision or retinal change during or subsequent to the administration of chloroquine" and recommending periodic ophthalmologic examination.[8]

In addition to all of the above evidence, the record contains a number of letters describing visual complications in patients who had been treated with Aralen. We have reprinted the relevant extracts from those letters in the margin.[9] One physician reported corneal

8. The "Dear Doctor" letter read as follows:
IMPORTANT DRUG PRECAUTIONS
Dear Doctor:

The recent experience of various investigators has shown that Aralen (brand of chloroquine), used alone or as an adjunct to other drugs and therapeutic measures, may be very helpful in the management of patients with lupus erythematosus or rheumatoid arthritis. Although many physicians have found that the incidence of serious side effects is lower than that encountered with other potent agents that are often employed in such patients, certain ocular complications have sometimes been reported during prolonged daily administration of chloroquine. Therefore, when chloroquine or any other antimalarial compound is to be given for long periods, it is essential that measures be taken to avoid or minimize these complications.

Thus initial and periodic (trimonthly) ophthalmologic examinations (including expert slit-lamp, fundus and visual field studies) should be performed. The initial examination will reveal if any visual abnormalities, either coincidental or due to the disease, are present and will establish a base line for further assessment of the patient's vision. Should corneal changes occur (which are thought to be reversible and which sometimes even fade on continuance of treatment), the advantages of withdrawing the drug must be weighed

in each case against the therapeutic benefits that may accrue from continuation of treatment (sometimes a severe relapse follows withdrawal). If visual disturbances occur—which are not fully explainable by difficulties of accommodation or corneal opacities—and particularly if there is any suggestion of visual field restriction or retinal change, administration of the drug should be stopped immediately and the patient closely observed for possible progression.

We should like to request your cooperation in reporting to Winthrop Laboratories or to the Food and Drug Administration any patients in your own practice who have developed impairment of vision or retinal change during or subsequent to the administration of chloroquine.

A reference card of a convenient size for filing is enclosed. It contains information of various indications for Aralen (including lupus erythematosus, rheumatoid arthritis, malaria and amebiasis), dosage, side effects and precautions.

Very truly yours,
/s/ E. J. Foley
E. J. Foley, M.D.
Vice President
Medical Director

9. Letter from Dr. Richard Weiss, St. Louis, Mo.: Says that lupus patient is slowly losing her eyesight and wonders if Aralen might in any way be responsi-

opacities as early as March, 1957. Another wrote in May, 1959 to ask "if you have heard of any retinal damage resulting from Aralen."

On these facts the jury found for defendent, and plaintiff appeals.

## II.

■ Under Connecticut law, the manufacturer of a "defective" product may be liable to the ultimate consumer in either warranty or tort. See generally Comment, Products Liability in Connecticut, 40 Conn.B.J. 155 (1966). The two theories frequently overlap, and indeed, breach of warranty had its origins as a tort action. "The recognition of such a right of action rested on the public policy of protecting an innocent buyer from harm rather than on the ensuring

ble. "Consultation with an ophthalmologist .was obtained and he stated that he thought the eye condition was due to the lupus and not to the Aralen and that is where we will have to leave it for the present." (July 30, 1956.)

Letter from detail man, Atlanta, Ga.: Atlanta dermatologist reports that Aralen patient became "blinded" for a few hours and that Aralen treatment has been stopped. (September 21, 1957.)

Letter from Dr. Joseph Goldstein, New York, N. Y.: Several patients have developed side reactions, one "particularly bad. Fortunately, in all of these cases the symptoms cleared after the medication was discontinued." (December 4, 1957.)

Letter from Dr. Pierre G. Jenkins, Charleston, S. C.: Says that he had treated three patients "who complained of colored halos in their vision. * * * None have complained of visual impairment, and there has been no loss of accommodation that could be attributed to this drug." (February 8, 1958.)

Letter from Dr. Robert A. Ballou, Point Pleasant, N. J.: Reports "the presence of punctate corneal opacities" in a patient taking Aralen. "Interestingly, the medication was discontinued over one month ago and these lesions have shown a definite decrease in number." (February 17, 1958.)

Letter from Dr. George F. Gsell, Wichita, Kan.: "Two years ago I had under my care a patient who developed very fine clouding of the corneal epithelium while on the drug. The clouding disappeared in about three weeks after cessation. Recently I have seen another patient with a similar finding and also developed the history that he had been on Aralen for some time." (April 2, 1958.)

Inter-office memo: Dr. Leon Goldman of Cincinnati, O. has observed "progressive eye changes tending toward blindness: in three lupus patients undergoing long-term treatment with antimalarials." "He is in a quandary to determine whether the eye changes are due to the lupus erythematosus or the antimalarial therapy." (May 5, 1958.)

Letter from Dr. Robert W. Zeller, University of Oregon Medical School: Six patients showed "abnormal opacifications of the corneal epithelium and entire stroma. Some of these patients have complained of blurred vision or of seeing halos around lights." (June 18, 1958.)

Letter from Dr. Arthur W. Bagnall, Vancouver, B. C.: "Three patients out of 150 treated for over one year and up to five years have complained of blurring of vision, all within the first six months of therapy. One patient had difficulty in changing from short to long focus and two had the reverse. * * * None of these three patients was referred to an ophthalmologist because the symptoms cleared so that I am unable to give you any idea of slit-lamp findings." (July 11, 1958.)

Letter from Dr. Arthur W. Bagnall, Vancouver, B. C.: Reports "macular degeneration" in patient treated with Aralen. (October 10, 1958.)

Letter from Dr. M. E. Nugent, Bismarck, N. D.: Reports "swelling" of retinal area "between the internal limiting membrane and the nerve fiber layer" in rheumatoid arthritis patient. "In your descriptive literature of Aralen, you mention that visual disturbances are one of the occasional side effects, but I find no description of the location of the pathology which accounts for the visual disturbance. Temporarily, we have stopped this patient's Aralen intake to see whether any change in the vision or retinal disturbance will follow." (October 7, 1959.)

Letter from Dr. Robert P. Burns, University of Oregon Medical School: "Recently we have observed pigmentary degeneration of the retina in two patients which appeared to be associated with the administration of chloroquine." (August 15, 1960.)

Letter from Dr. H. M. Simpson, Florence, Ala.: Complains that patient taking Aralen has "developed a marked narrowing of the fundal arteries and her vision has become worse." (October 3, 1960).

of any contractual rights." Hamon v. Digliani, 148 Conn. 710, 716, 174 A.2d 294, 296 (1961). As a cite by Professor Kessler suggests, the concept of warranty can best be understood as "a hybrid of contract and tort law." Kessler, Products Liability, *supra* at 909. See also Kessler, The Protection of the Consumer Under Modern Sales Law: Part I, 74 Yale L.J. 262, 280 (1964); Prosser, The Assault Upon the Citadel (Strict Liability to the Consumer), 69 Yale L.J. 1099, 1126–1127 (1960).

In the tort area, the Connecticut Supreme Court has adopted the strict liability position taken by § 402A of the Restatement (Second) of Torts.[10] See Hamon v. Digliani, *supra;* Garthwait v. Burgio, 153 Conn. 284, 216 A.2d 189 (1965); Rossignol v. Danbury School of Aeronautics, 154 Conn. 549, 227 A.2d 418 (1967). While § 402A imposes strict liability on the seller who markets a product "in a defective condition unrea-

sonably dangerous" to the consumer, comment *k* makes an exception to the strict liability rule in the case of products characterized as "unavoidably unsafe." These include "products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use," and they are "especially common in the field of drugs." Restatement (Second), Torts § 402A, comment *k*. These are products which, as Professor Kessler points out, "[c]onsumers for a long time have lived with and accepted the risks inherent in their use." Kessler, Products Liability, *supra* at 930–931.

Although the imposition of strict liability for the idiosyncratic side effects of a drug is certainly not unthinkable,[11] comment *k* provides that such a drug is neither "defective" nor "unreasonably dangerous" in the § 402A sense if the manufacturer gives an adequate warning of the risks involved.[12]

10. § 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

11. *See,* for example, James, The Untoward Effects of Cigarettes and Drugs: Some Reflections on Enterprise Liability, 54 Calif.L.Rev. 1550, 1557 (1966): "That these risks are not more narrowly foreseeable does not mean that the maker cannot or should not provide for them and distribute them as costs typical of his enterprise."

12. For purposes of § 402A, it is generally agreed that the risk of idiosyncratic reaction is not a "defect" in the traditional sense. As Dean Wade observes, the phrase "defective condition" has no independent meaning in the case of "a product which was made in the way it was intended to be made and in the condition planned and which yet proves to be dangerous. * * * The only real problem is whether the product is 'unreasonably dangerous,' because 'defective condition,' if it is to be applied at all, depends on that." Wade, Strict Tort Liability of Manufacturers, 19 Sw.L.J. 5, 14–15 (1965).

Other commentators have suggested that the lack of adequate warning is what renders the product "defective" in the § 402A sense. See 2 Frumer & Friedman, Products Liability § 16A [4] [e] (1967). This was the approach followed in Davis v. Wyeth Laboratories, Inc., 399 F.2d 121 (9th Cir. 1968), a case in which the manufacturer sold Type III Sabin polio vaccine without warning of the statistical risk that one person in a million would contract polio from taking the vaccine. In that case, the court held that failure to warn of a known or foreseeable idiosyncratic reaction made the vaccine "unfit" or "unreasonably dangerous" in the § 402A sense. See also Toole v.

In this respect, comment *k* simply adopts the ordinary negligence concept of duty to warn. If proper warning is given "where the situation calls for it," the manufacturer is "not to be held to strict liability for unfortunate consequences * * * merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk." Restatement (Second), Torts § 402A, comment *k*. The reason for relaxing strict liability, as Professor Kessler suggests, is because "[s]ufficient user experience is indispensable to research, and making the supplier a guarantor of safety without such research may be regarded as too burdensome." Kessler, Products Liability, *supra* at 931.

■■ Our case presents special problems because when chloroquine was first developed and tested, there was no known or foreseeable risk of idiosyncratic retinal damage. Thus, defendant could not initially be expected to warn of unknown dangers. When the risk became apparent, however, a duty to warn attached. Davis v. Wyeth Laboratories, Inc., 399 F.2d 121, 129 (9th Cir. 1968). On the facts here, there can be no doubt that defendant made some effort to warn as early as 1960, although there was some evidence from which the jury could find that a more effective warning was required under the circumstances. Cf. Sterling Drug, Inc. v. Yarrow, 408 F.2d 978 (8th Cir. 1969). The "Dear Doctor" letters were not sent until January, 1963. The question of the timeliness of such warnings was certainly for the jury, and for this reason alone we think that Judge McLean quite properly refused to direct a verdict for plaintiff. See Sterling Drug, Inc. v. Cornish, 370 F.2d 82, 84 (8th Cir. 1966).

■ As Davis v. Wyeth Laboratories, Inc., *supra*, makes clear, there is no strict liability under comment *k* unless the consumer first establishes a breach of the manufacturer's duty to warn. This can be done by showing either (1) that the manufacturer did not warn of a known danger, Toole v. Richardson-Merrell, Inc., 251 Cal.App.2d 689, 60 Cal.Rptr. 398, 414 (1967), or (2) that the manufacturer gave inadequate warnings, Sterling Drug, Inc. v. Yarrow, *supra*. In the case of prescription drugs, the manufacturer can fulfill its duty to warn by warning the medical profession of the side effects of the drug. "In such cases the choice involved is essentially a medical one involving an assessment of the medical risks in the light of the physician's knowledge of his patient's needs and susceptibilities. Further it is difficult under such circumstances for the manufacturer, by label or direct communication, to reach the consumer with a warning. A warning to the medical profession in such cases is the only effective means by which a warning could help the patient." Davis v. Wyeth Laboratories, Inc., *supra* at 130.

■ As we indicated earlier, there is no duty to warn of unknown or unforeseeable risks. Dates are thus vitally important, since the duty to warn depends on when the risk became apparent. According to the records kept by Yale-New Haven Hospital, plaintiff took Aralen from April, 1953 to January, 1957. Defendant did not warn of the risk of idiosyncratic reaction until 1960. Thus, the only real question with respect to Aralen is whether the risk was either knowable or reasonably foreseeable at a time when plaintiff was still taking the drug. On the facts of· this case, this was properly a jury question. (In this connection it should be noted that the Cambiaggi article was not published until March, 1957 and that the Hobbs Report did not appear until October, 1959.)

■ Plaintiff took Triquin from November, 1959 to October, 1961. The evidence fairly established that Triquin produces the same idiosyncratic reaction as

Richardson-Merrell, Inc., 251 Cal.App.2d 689, 60 Cal.Rptr. 398, 414 (1967) ("strict liability is justified on the ground that the product was marketed without proper warning of its known dangerous result").

Aralen, and thus the jury might well have found that plaintiff would have developed chloroquine retinopathy even if she had been treated only with Triquin.[13] Since defendant admits that it learned of the risk of idiosyncratic reaction at the time when plaintiff was taking Triquin, the crucial question with respect to this drug is whether defendant made adequate efforts to warn. This, too, was a jury question.

### III.

■ For the reasons stated above, we reject plaintiff's contention that she was entitled to a directed verdict as a matter of law. Since defendant did make various efforts to warn, including the mailing of the "Dear Doctor" letters, our case is unlike Davis v. Wyeth Laboratories, Inc., *supra*, where the evidence was overwhelming that the manufacturer not only knew that the vaccine was being dispensed at mass clinics without any warning, but also "attempted to assure all members of the community that they should take the vaccine." *Id.* at 131.

■ We also reject plaintiff's contention that Judge McLean erred in not instructing the jury on any of the following theories of products liability: (1) breach of implied warranty, (2) negligence, (3) breach of express warranty, and (4) fraud on the Food and Drug Administration. If there is any negligence in this case, it grows out of the fact that defendant may not have adequately warned of known or reasonably foreseeable idiosyncratic reactions, and as we explained earlier, this is precisely what plaintiff must establish to make out a case of strict liability under comment *k*. Since the two theories are virtually identical, separate instructions were not necessary. Cf. Systems, Inc. v. Bridge Electronics Co., 335 F.2d 465 (3d Cir. 1964).

■ Similarly, it was not error to refuse to instruct the jury on breach of implied warranty, since the "defect" necessary for the imposition of strict liability is the equivalent of an implied warranty of merchantability. In Santor v. A & M Karagheusian, Inc., 44 N.J. 52, 207 A.2d 305, 16 A.L.R.3d 670 (1965), for example, the New Jersey Supreme Court indicated that "defective" for purposes of § 402A meant "not reasonably fit for the ordinary purposes for which such articles are sold and used." 207 A.2d at 313. Similarly, the New York Court of Appeals has said that the "strict tort liability" doctrine is "surely a more accurate phrase" than breach of implied warranty of fitness for ordinary use. Goldberg v. Kollsman Instrument Corp., 12 N.Y.2d 432, 437, 240 N.Y.S.2d 592, 594, 191 N.E.2d 81, 82 (1963). For other cases equating strict liability in tort with implied warranty, see Greeno v. Clark Equipment Co., 237 F.Supp. 427, 429 (N.D.Ind.1965) (strict liability under § 402A "is hardly more than what exists under implied warranty when stripped of the contract doctrines of privity, disclaimer, requirements of notice of defect, and limitations through inconsistencies with express warranties"); Davis v. Wyeth Laboratories, Inc., *supra*, 399 F.2d at 126 (the difference between implied warranty and strict liability in tort "is largely one of terminology"); Cintrone v. Hertz Truck Leasing & Rental Service, 45 N.J. 434, 212 A.2d 769 (1965) (warranty allegations treated as stating a cause of action for strict liability in tort); cf. Rossignol v. Danbury School of Aeronautics, Inc., *supra*. We recognize, of course, that the Restatement and the Uniform Commercial Code take divergent positions with respect to the requirement of notice and the availability of disclaimers. See Kessler, Products Liability, *supra* at 904–908; Franklin,

---

13. Although most of the early cases of chloroquine retinopathy involved Aralen, more recent studies have indicated that the same condition has been observed in patients being treated with Triquin. See

Henkind & Rothfield, Ocular Abnormalities in Patients Treated with Synthetic Antimalarial Drugs, 269 N.E.J.Med. 433 (1963).

When Worlds Collide: Liability Theories and Disclaimers in Defective-Products Cases, 18 Stan.L.Rev. 974 (1966). In the instant action, however, there are simply no issues concerning either notice or attempted disclaimer. Thus, there was no need for separate instructions on the theory of implied warranty. Davis v. Wyeth Laboratories, Inc., *supra.*

■ On the question of breach of express warranty, we need say only that defendant did not represent either (1) that its drugs were free from all harmful side effects or (2) that its drugs were absolutely harmless. Since there were no such express representations, Judge McLean was correct in refusing to charge the jury on breach of express warranty. Cf. Randy Knitwear, Inc. v. American Cyanamid Co., 11 N.Y.2d 5, 226 N.Y.S.2d 363, 181 N.E.2d 399 (1962) (resin manufacturer affirmatively represented on label that fabrics treated with "Cyana Finish" would not shrink or lose their shape); Pritchard v. Liggett & Myers Tobacco Co., 295 F.2d 292, 296 (3d Cir. 1961) (cigarette manufacturer advertised that "Nose, throat and accessory organs not adversely affected by smoking Chesterfields"); 2 Frumer & Friedman, Products Liability § 16.02 (1967).

■ On the facts here, we hold that plaintiff failed to establish a prima facie case of fraud upon the Food and Drug Administration, and thus we need not decide if such fraud would give rise to a private damage action. Cf. Roginsky v. Richardson-Merrell, Inc., 378 F.2d 832 (2d Cir. 1967). While it is true that the FDA was not notified of the Cambiaggi article when it first appeared, there was a complete failure of proof on the issue of fraudulent intent, and indeed, the article itself concluded that "chloroquine can be ruled out as a causative factor" of the retinal damage described. Apart from the Cambiaggi article, there was no evidence of fraudulent misrepresentation or concealment, and we think that Judge McLean quite properly refused to submit the fraud question to the jury. In this respect,

our case is quite unlike *Roginsky,* where there was substantial evidence that the manufacturer had deliberately concealed the results of certain experiments from the FDA.

## IV.

We come now to the alleged errors in the instructions on strict liability. Judge McLean began by telling the jury that it should first decide the question of causation, and said that if the jury resolved this in favor of plaintiff, it should next consider the question of duty to warn. He explained that a drug is not "defective" in the § 402A sense if it is "accompanied by proper directions and a proper warning where the situation calls for a warning," and further explained that defendant would be liable for failure to warn of known or foreseeable risks. In accordance with comment *k,* he told the jury that a drug manufacturer "has a duty to make reasonable efforts to warn the medical profession whom he knows will prescribe the drug for patients of the danger of those side effects, provided that the manufacturer knows the danger or by the application of reasonable, developed human skill and foresight should know of the danger." As we indicated earlier, this is undoubtedly an accurate statement of the duty to warn under comment *k.* See Davis v. Wyeth Laboratories, Inc., *supra;* 3 Frumer & Friedman, Products Liability § 33.02 [4] (1967).

We find reversible error, however, in the way the jury was instructed on the issue of causation. On this issue, the jury was instructed to consider simply whether plaintiff's blindness resulted from her taking one or more of defendant's drugs. More specifically, Judge McLean told the jury that it should decide whether plaintiff's blindness "was caused by Aralen or by Atabrine or by Triquin, or by any two of these, or by all three of them, or by none. * * * [I]f you find that the damage was caused by one or more of these drugs, then you will go on to consider [the question of duty to warn]."

For reasons which will appear, we believe that plaintiff was entitled to more detailed instructions on the law of multiple causation. Suppose, for example, that the jury found (1) that plaintiff's blindness was caused by a combination of Aralen and Triquin, and (2) that the risk of chloroquine retinopathy did not become known until 1959. Suppose also that the jury found (3) that there was no breach of the duty to warn with respect to Aralen, but (4) that defendant gave inadequate warnings with respect to Triquin. On these facts, plaintiff would be entitled to recover if the jury found that either Aralen or Triquin alone would have been sufficient to produce chloroquine retinopathy, and that Triquin was a "substantial factor" in producing her injury. The jury should have been so instructed, and indeed, the court's failure to give explicit instructions may have created the erroneous impression that defendant would not be liable under such circumstances unless there was a breach of the duty to warn *with respect to both drugs*.[14]

 Ordinarily, the concept of proximate cause can be stated in terms of a "but for" test: defendant's negligence is a cause in fact of an injury where the injury would not have occurred *but for* defendant's negligent conduct. 2 Harper & James, The Law of Torts § 20.2 at 1110 (1956). The test will not work, however, in the situation where two independent forces concur to produce a result which either of them alone would have produced. In such a situation, either force can be said to be the cause in fact of the harm, despite the fact that the same harm would have resulted from either force acting alone. 2 Harper & James, *supra* at 1122–1123. See also § 432(2) of the Restatement (Second) of Torts, which provides:

> If two forces are actively operating, one because of the actor's negligence, the other not because of any misconduct on his part, and each of itself is sufficient to bring about harm to another, the actor's negligence may be found to be a substantial factor in bringing it about.

By way of illustration, the Restatement uses the example of a house standing in the path of two fires, one set by the negligence of the A Company and the other of unknown or innocent origins. The fires merge and then destroy the house. Under these circumstances, the Restatement provides that the negligence of the A Company may be considered the legal cause of harm if such negligence is found to be a "substantial factor" in producing the damage.[15]

The reason for imposing liability in such a situation, as Harper and James explain, is that the "defendant has committed a wrong and this has been *a* cause of the injury; further, such negligent conduct will be more effectively deterred by imposing liability than by giving the wrongdoer a windfall in cases where an all-sufficient innocent cause happens to concur with his wrong in producing the harm." 2 Harper & James, *supra* at 1123. Similarly, in Navigazione Libera T. S. A. v. Newtown Creek Towing Co., 98 F.2d 694, 697 (2d Cir. 1938), Judge Learned Hand stated that "the single tortfeasor cannot be allowed to escape through the meshes of a logical net. He is a wrongdoer; let him unravel the casuistries resulting from his wrong." See also Malone, Ruminations on Cause-In-Fact, 9 Stan.L.Rev. 60, 88–94 (1956). The contrary arguments[16] have been rejected by the Re-

---

14. In instructing the jury, Judge McLean told the jury that proximate cause meant a cause "without which the injury would not have occurred." This is simply another way of stating the "but for" test.

15. The example is based on Anderson v. Minneapolis, St. Paul & St. Ste. Marie Railway, 146 Minn. 430, 179 N.W. 45 (1920).

16. The case for non-liability is well stated in Peaslee, Multiple Causation and Damage, 47 Harv.L.Rev. 1127, 1130 (1934):

> [W]here one of the causes is innocent and the other culpable in origin, as of the two fires uniting before reaching and burning the plaintiff's house, must the negligent actor pay the whole loss, or is he responsible for none of it? On the

statement, and there is good reason to believe that the Connecticut courts would follow the Restatement approach. Cf. Edgecomb v. Great Atlantic & Pacific Tea Co., 127 Conn. 488, 18 A.2d 364 (1941); Mahoney v. Beatman, 110 Conn. 184, 147 A. 762, 66 A.L.R. 1121 (1929).

■ Assuming *arguendo* that the risk of chloroquine retinopathy did not become known until 1959, and that plaintiff's blindness could have been caused by either Aralen or Triquin, we have a situation which closely resembles the Restatement example. Since the jury could arguably have found a breach of the duty to warn with respect to Triquin but not Aralen, then the Triquin would be analogous to the negligently started fire, while the Aralen would be analogous to the fire of unknown or innocent origins. We conclude, therefore, that the jury should have been instructed on the "substantial factor" test of multiple causation.

### V.

■ We also find plain error in the court's repeated references to "appreciable number of users" in stating the duty to warn test. The manufacturer is obligated to warn in cases where the drug may affect only a small number of idiosyncratic or hypersensitive users, and

the obligation to warn attached regardless of whether the number of persons affected can fairly be said to be "appreciable." The applicable standard was well stated in Wright v. Carter Products, Inc., 244 F.2d 53 (2d Cir. 1957), where Judge Waterman said that "duties to warn are not in all cases, measured by quantitative standards," *id.* at 56, and that a manufacturer may in some circumstances have a duty to warn "those few persons who it knows cannot apply its product without serious injury." *Id.* at 58. See also Davis v. Wyeth Laboratories, Inc., *supra*; Sterling Drug, Inc. v. Cornish, *supra*; Gober v. Revlon, Inc., 317 F.2d 47 (4th Cir. 1963).

### VI.

We have assumed for purposes of discussion that plaintiff's blindness was caused by one or more of defendant's drugs. Actually, there was conflicting medical evidence at trial on the issue of causation, including a statement by the Eye Clinic of Yale-New Haven Hospital to the effect that "the disease was not caused by chloroquine retinopathy." [17] On remand we strongly recommend that special interrogatories be used to resolve at least the issue of causation. Even in cases where liability is perfectly strict, plaintiff "still has the burden of estab-

---

one hand is sufficient wrongful causation of a physical result, and on the other, inevitable loss not increased by the defendant's wrong. Recovery would make the plaintiff better off than he would have been if the defendant had done no wrong. So long as the innocent cause is in actual, inescapable operation before the wrongful act becomes efficient, it is not apparent how the latter can be considered the cause of the loss. Causation is matter of fact, and that which is not in fact causal ought not to be deemed so in law.

17. Defendant advanced the theory that lupus erythematosus was capable of producing blindness "with or without any drugs," and called a number of experts who elaborated on this theory. One dermatologist testified, for example, that there were two varieties of the lupus disease, "discoid" lupus and "disseminat-

ed" lupus, and said that while discoid lupus is a fairly harmless blotching of the skin, disseminated lupus is a "remarkably serious condition" which attacks every organ and tissue in the body, including the eyes, and ultimately results in death. The dermatologist also pointed out that it was possible for discoid lupus to develop into the acute or disseminated form. When this happens, he said, the usual practice is to "use the drug or the treatment which will help the patient and disregard side effects at the moment and later on take care of the side effects." The only testimony concerning Mrs. Basko, however, was that she apparently suffered from discoid lupus.

On cross-examination Dr. Bernstein admitted that various studies showed "a significant incidence of retinopathy in patients with [disseminated] lupus," regardless of chloroquine treatment.

lishing that the particular defendant has sold a product which he should not have sold, and that it caused his injury." Prosser, The Fall of the Citadel (Strict Liability to the Consumer), 50 Minn.L. Rev. 791, 840 (1966).

Reversed and remanded for new trial.[18]

18. Unfortunately the judge's task of preparing a proper charge in this case was unnecessarily complicated by plaintiff's dumping in the judge's lap a bucket of requests for charge, some 228 in number. We assume that on a new trial this performance will not be repeated.