435 F.Supp. 1116 (1977)
CAPLACO ONE, INC. and Hanover Insurance Company, Plaintiffs,
v.
AMEREX CORPORATION, Defendant.
No. 76-470C(A).
United States District Court, E. D. Missouri, E. D.
August 1, 1977.
*1117 Theodore D. Ponfil, Clayton, Mo., for plaintiffs.
Ralph C. Kleinschmidt, St. Louis, Mo., for defendant.

MEMORANDUM OPINION
HARPER, District Judge.
Plaintiffs, Caplaco One, Inc. (hereinafter referred to as Caplaco) and Hanover Insurance Company (hereinafter referred to as Hanover), bring this action for damages sustained as a result of a fire which occurred when a fire extinguisher manufactured by defendant, Amerex Corporation (hereinafter referred to as Amerex), failed to operate. Plaintiff Caplaco is a Missouri corporation, plaintiff Hanover is a New York corporation, and defendant is an Alabama corporation, having a principal place of business in that state. The jurisdiction of this Court is invoked under 28 U.S.C. § 1332(a) inasmuch as diversity of citizenship exists between plaintiffs and defendant and the amount in controversy exceeds $10,000.00.
Plaintiffs' action was tried before this Court without a jury. The parties thereafter submitted memoranda of law in support of their respective positions. The credible testimony, pleadings, exhibits and stipulation disclose the following facts:
Plaintiff Caplaco is the owner of the apartment building which was extensively damaged as a result of a fire occurring on January 19, 1974. Plaintiff Hanover has paid a claim for restoration of the property to Caplaco, pursuant to its policy of insurance, and is asserting its subrogation rights herein for the amount of the claim. Caplaco seeks to recover rental income which was lost during the period the building was under repair. The amounts of damages and their respective allocation have been established by stipulation among the parties.
The fire involved herein was ignited by Caplaco's maintenance man, Michael Ponder, during the performance of his work duties. Ponder testified that among his duties as a maintenance man was that of repairing water pipes which had frozen in the vacant apartments. According to Ponder, this particular duty required him to break through the wall of the apartment, remove the insulation, and do a certain amount of soldering through the use of an acetylene torch. In utilizing the torch, the paper covering the insulation would on occasion catch fire. Ponder stated that these fires were generally small or insignificant and that he would put them out by a flick of his fingers or by a pat from his hand.
However, approximately two weeks prior to the fire on January 19th, Ponder after flicking out such a fire, went to the apartment office, retrieved the fire extinguisher, and took it back to the location of the fire. Ponder stated that as a safety precaution, he gave a short burst from the extinguisher, amounting in his estimation to a one second discharge, on the place where the fire had occurred. Ponder then replaced the safety pin and took the extinguisher back to the office. Ponder noted at that time that the pressure gauge located on top of the extinguisher indicated that it did not need recharging.
The fire extinguisher apparently remained in the office untouched until Ponder removed it on January 18th, the day before the big fire. On that day, Ponder picked up the extinguisher and took it to another building in anticipation of the work he was to do the following day. Ponder did not look at the gauge at that time. He did, however, observe that the fire extinguisher was in the spot where he had previously left it.
*1118 On the next day, January 19, 1974, Ponder was again using the acetylene torch to repair some frozen pipes. The fire extinguisher was standing next to him, where he had placed it the day before. Ponder did not check the pressure gauge at this time. While using the torch the paper around the insulation caught fire. Ponder initially tried to pat the fire out as he had done before. This method failing, he took the extinguisher, removed the safety pin, and attempted to use it. The extinguisher failed to operate. The fire spread and caused extensive damage to the building, resulting in the losses incurred by plaintiffs. Ponder further testified that initially the fire was small and that had the fire extinguisher been operable, the fire would have been put out.
The fire extinguisher which failed to operate was manufactured by defendant in the ordinary course of its business. The extinguisher is a portable dry commercial fire extinguisher which operated as a result of gas pressure. A sufficient amount of gas pressure must be maintained in the vessel in order for it to function properly. The extinguisher is equipped with a pressure gauge which indicates the amount of pressure in the extinguisher and whether it needs recharging. Also, operating and maintenance instructions are embossed on a permanently attached metal band. Contained thereon and underlined, are the words, "RECHARGE IMMEDIATELY AFTER USE."
Tests performed by plaintiffs' expert witness, John Senne, established that it would take a discharge of a fifteen to sixteen-second duration to expel all of the extinguishing agent. He also testified that a one-second blast from the extinguisher would result in the gauge still indicating that no recharging of the extinguisher would be necessary. A three-second blast is necessary in order for the arrow of the gauge to indicate recharge.
A characteristic of this type of extinguisher, as established by Senne and by admission of defendant, is that when the extinguisher is used, regardless of the duration of the use, some particles of the extinguishing agent remain on the surface of the pressure valves. These valves operated to seal the pressure in the unit. Because particles of the extinguishing agent settle upon the valves, a tight resealing is prevented, so that in a few hours up to a day, depending upon the amount of extinguishing agent on the valves, the remaining pressure in the extinguisher dissipates. This renders the extinguisher inoperable.
Testimony by the president of Amerex, Edgar Paine, indicated that the defendant was aware of this resealing condition. According to him, this condition is present on approximately twenty percent of the fire extinguishers on the market. No evidence was offered by plaintiffs which indicated that the extinguisher was manufactured in any manner other that it was intended to be. Further, the extinguisher was approved by Underwriters' Laboratories, Inc. By admission of defendant, the particular extinguisher involved herein was in substantially the same condition as when it was manufactured.
Plaintiffs set out in their complaint two counts. Under Count I, plaintiffs seek recovery by reason of defendant's alleged negligence in failing to provide adequate warnings to plaintiffs as consumers of defendant's product. Under Count II, plaintiffs seek recovery on the basis of strict liability. The Court will deal with the strict liability count first.
Missouri has adopted Section 402A of the Restatement (Second) of Torts (1965) (hereinafter referred to as Section 402A), which permits the liability of the supplier of a chattel to be determined under the doctrine of strict liability. Keener v. Dayton Electric Mfg. Co., 445 S.W.2d 362, 364 (Mo. 1969). That section provides:
"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
"(a) the seller is engaged in the business of selling such a product, and

*1119 "(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
"(2) The rule stated in Subsection (1) applies although
"(a) the seller has exercised all possible care in the preparation and sale of his product, and
"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."
The general proposition as stated therein is that strict liability shall attach to a manufacturer who sells a product "in a defective condition unreasonably dangerous" to the consumer. These requirements are usually treated separately, "defective condition" and "unreasonably dangerous", in the typical products liability case. In the case at bar, however, plaintiffs have not shown nor do they contend that there was imperfection in the construction of the fire extinguisher. Where the product is made precisely as it was intended to be made, the true test is whether the product is unreasonably dangerous when put to a use reasonably anticipated. Polk v. Ford Motor Co., 529 F.2d 259, 269-70 (8th Cir. 1976) (applying Missouri law); Davis v. Wyeth Industries, 399 F.2d 121, 128 (9th Cir. 1968); Wade, Strict Tort Liability of Manufacturers, 19 Sw.L.J. 5, 14-15 (1965).
Comment i to Section 402A provides that in order for a product to be unreasonably dangerous, "[t]he article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." It is clear from the testimony of Ponder and by admission of defendant's president, Paine, that the ordinary consumer would not anticipate that a one-second burst would create a leak in the extinguisher necessitating a recharge.
Comment j to Section 402A recognizes that to prevent a product from being unreasonably dangerous, directions or warnings must be given in appropriate cases. It provides: "In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use." The duty to warn is clear in this case. The ordinary consumer would not be aware of this resealing condition. Liability therefore turns on the adequacy of the warning given.
As stated earlier, the words "RECHARGE IMMEDIATELY AFTER USE" are embossed on a metal collar permanently attached to the extinguisher. Plaintiffs in their brief contend that this warning does not convey to the user a one-second use is not a "use" requiring recharging. While the Court is sympathetic to plaintiffs' argument in this regard, plaintiffs overlook the functions and attributes of the pressure gauge. The pressure gauge serves as a clear descriptive warning as to whether the vessel contains enough pressure to operate. Plaintiffs did not show that the pressure gauge failed to function properly. Presumably, then, the gauge was working and indicated that a recharge was necessary immediately prior to the time of the fire. Had Ponder looked at the gauge on January 18, 1974, when he removed the extinguisher from the office for the second time, or prior to work on January 19, 1974, he would have realized that the extinguisher would not work. Comment j to Section 402A provides: "Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous." The pressure gauge gives a clear and adequate warning of the condition of the fire extinguisher. When the indicator reads "Recharge" it is obvious to the ordinary user that the vessel contains an inadequate amount of pressure to function properly. The Court finds that an adequate warning was given on the fire extinguisher and that, therefore, it is not unreasonably dangerous or defective within the context of Section 402A.
Plaintiffs also contend in their brief that the fire extinguisher is an "unavoidably unsafe product" within the scope of Comment k of Section 402A. It provides:

*1120 "There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous."
The Court rejects plaintiffs' contention that the fire extinguisher is an unavoidably unsafe product. The unsafe characteristics of the fire extinguisher can be readily avoided by a timely look at the pressure gauge and recharge when necessary. Comment k applies only where the danger is unavoidable, inevitable, as where there are dangerous side effects to a drug.
Assuming arguendo that Comment k does apply, liability does not attach where proper warnings are present and where the utility of the product outweighs the dangers accompanied by its use. Davis v. Wyeth Laboratories, Inc., supra, at 128-129. As stated earlier, the Court has found the warnings adequate to apprise the consumer of the condition of the fire extinguisher, and also finds that the utility of the fire extinguisher outweighs any danger which accompanies it.
The Court's finding of adequate warnings under Count II of plaintiffs' complaint based on strict liability, necessarily disposes of Count I of plaintiffs' complaint which asserts negligence in failing to provide adequate warnings.
Accordingly, for the above reasons, the Court finds for the defendant, Amerex Corporation.
The Court adopts this memorandum opinion as its findings of fact and conclusions of law, and the clerk of the Court is directed to prepare and enter the proper judgment in accordance with the Court's findings herein.